UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| AMERGENT HOSPITALITY GROUP, INC.; | § | Case No. 24-42483-MXM-11 |
| et al.,[1] | § | (Jointly Administered) |
| | § | Chapter 11 |
| Debtors. | § | |

### DISCLOSURE STATEMENT
### FOR THE JOINT CHAPTER 11 PLAN OF LIQUIDATION AMERGENT HOSPITALITY GROUP, INC. AND ITS JOINTLY ADMINISTERED DEBTORS

Dated: March 11, 2021

Richard G. Grant
Tex. Bar No. 08302650
CM LAW PLLC
National Litigation Support Center
13101 Preston Road, Suite 110-1510
Dallas, Texas 75240
Telephone: 214-210-2929
Email: rgrant@cm.law

ATTORNEYS FOR
DEBTOR IN POSSESSION

---

[1] The jointly administered debtors (the "Jointly Administered Debtors") are Amergent Hospitality Group, Inc. (24-42483); I10/I20 Cuisine LLC (24-42482); LBB Acquisition, LLC (24-42484); LBB Acquisition 1 LLC (24-42485); LBB Platform LLC (24-42487); LBB Lake Oswego LLC (24-42489); LBB Progress Ridge LLC (24-42490); Noveno LLC (Alberta) (24-42491); Quinto LLC (Division) (24-42492); Sexto LLC (Waterfront) (24-42493); and Cuarto LLC (Eugene) (24-42494).

***THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.*** **ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

Each of the Jointly Administered Debtors (collectively, the "Debtors"), are providing you this document and the accompanying materials (this "Disclosure Statement") because you may be a creditor entitled to vote to accept or reject the *Amended Joint Chapter 11 Plan of Liquidation for Amergent Hospitality Group, Inc. and Its Jointly Administered Debtors* (including all exhibits and schedules attached thereto, and as may be amended, altered, modified, or supplemented from time to time, the "Plan"),[2] attached hereto as Exhibit A.

## DISCLAIMER

This Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, and certain events occurring in the Chapter 11 Cases. Although the Debtors believe that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that they do not set forth the entire text of such documents or statutory provisions or every detail of such events. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern for all purposes. Factual information contained in this Disclosure Statement has been provided by the Debtors' management, professionals, and the Chapter 11 Trustees except where otherwise specifically noted.

The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there can be no assurance that the statements contained herein will be correct at any time after this date. Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, except as otherwise provided in the Plan or in accordance with applicable law. The information contained in this Disclosure Statement, including the information regarding the history, businesses, and operations of the Debtors and the liquidation of the Debtors' assets, is included for purposes of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as an admission or stipulation, but rather as a statement made in settlement negotiations as part of the Debtors' attempt to settle and resolve claims and controversies pursuant to the Plan. This Disclosure Statement will not be admissible in any non-bankruptcy proceeding, nor will it be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan as to holders of Claims against, or Interests in, the Debtors. The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission. Except where specifically noted, the financial information contained in this Disclosure Statement and the exhibits hereto has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States.

The Debtors have not authorized any Person or Entity in connection with this Disclosure Statement, the Plan, or the solicitation of votes on the Plan (the "Solicitation") to give any information or make any representation or statement regarding this Disclosure Statement, the Plan, or the Solicitation, in

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan (defined below).

each case, other than that which is contained in this Disclosure Statement and the exhibits hereto or as otherwise incorporated by reference or referred to herein. If any such information, representation, or statement is given or made, it may not be relied upon as having been authorized by the Debtors.

_____

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 6

ARTICLE I. Overview of the Disclosure statement and plan ............................................... 6

ARTICLE II. BUSINESS OVERVIEW AND CORPORATE HISTORY .............................. 6
    2.01    Overview of the Debtors' Business ................................................................. 6
    2.02    Prepetition Capital Structure .......................................................................... 8

ARTICLE III. EVENTS LEADING TO THE CHAPTER 11 FILINGS ............................... 9

ARTICLE IV. KEY EVENTS DURING THE CHAPTER 11 CASES ................................ 10
    4.01    Commencement of the Chapter 11 Cases ..................................................... 10
    4.02    No Formation of the Creditors' Committees ................................................ 10
    4.03    Petition Dates and First Day Motions ........................................................... 10
    4.04    Sale Motions ................................................................................................. 10
    4.05    Relief from Stay ........................................................................................... 11
    4.06    Monthly Operating Reports .......................................................................... 11
    4.07    Sales of Estate Assets ................................................................................... 11
        A.    Sale of Burgers Grilled Right (BGR) Restaurants ............................. 11
        B.    Sale of Little Big Burger (LBB) Restaurants .................................... 11
        C.    Sale of Boudreaux's Cajun Kitchen Restaurants .............................. 12
    4.08    Bar Date Orders ........................................................................................... 13
    4.09    Ongoing Investigations ................................................................................ 13

ARTICLE V. THE PLAN ..................................................................................................... 13

ARTICLE VI. VOTING PROCEDURES AND REQUIREMENTS ................................... 13
        A.    Classes Entitled to Vote on the Plan ................................................. 13
        B.    Votes Required for Acceptance by a Class ........................................ 14
        C.    Classes Not Entitled to Vote on the Plan .......................................... 15

ARTICLE VII. CONFIRMATION PROCEDURES ............................................................ 15
    7.01    Hearing on Confirmation ............................................................................. 15
    7.02    Requirements for Confirmation of the Plan .................................................. 16
        A.    Best Interests of Creditors ................................................................. 16
        B.    Feasibility ......................................................................................... 17
        C.    Acceptance by Impaired Class ........................................................... 17
        D.    Confirmation Without Acceptance by Impaired Class ....................... 18
        E.    Alternatives to Confirmation and Consummation of the Plan ........... 19

ARTICLE VIII. RISK FACTORS ........................................................................................ 19
    8.01    Objections to the Plan's Classification or Amounts of Claims and Interests ............. 19
    8.02    Failure to Satisfy Voting Requirements ........................................................ 19
    8.03    Amendment of Plan by the Debtors Prior to Confirmation ........................... 19
    8.04    Non-Confirmation or Delay of Confirmation of the Plan .............................. 19
    8.05    Non-Consensual Confirmation ..................................................................... 20
    8.06    Other Parties in Interest May Be Permitted to Propose Alternative Plans that Are Less
        Favorable to Certain Stakeholders ............................................................... 20

8.07    Conversion to Chapter 7 .................................................................................. 20

8.08    Proceeds of Sales ............................................................................................. 21

ARTICLE IX. Disclosure Statement Disclaimer.................................................................. 21

9.01    Information Contained Herein is for Soliciting Votes..................................... 21

9.02    No Legal or Tax Advice is Provided to You by this Disclosure Statement ............... 21

9.03    No Admissions Made......................................................................................... 21

9.04    Failure to Identify Claims, Litigation Claims or Projected Objections ..................... 21

9.05    No Waiver of Right to Object or Right to Recover Transfers and Assets ................. 21

9.06    Reliance Upon Debtors' Information................................................................. 21

9.07    Potential Exists for Inaccuracies, and the Debtors have no Duty to Update .............. 22

ARTICLE X. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF
THE PLAN ............................................................................................................................. 22

10.01    A. U.S. federal income tax consequences of the Plan. ................................. 22

10.02    Certain Federal Income Tax Consequences to the Debtors ........................... 22

10.03    Federal Income Tax Treatment of the Trust .................................................. 24

10.04    Federal Income Tax Consequences to Holders of Claims ............................. 25

10.05    Allocation of Consideration to Interest.......................................................... 26

10.06    Federal Income Tax Treatment of Holders of Equity Interests ..................... 26

10.07    Reservation of Rights....................................................................................... 27

ARTICLE XI. CONCLUSION AND RECOMMENDATION ............................................. 27

*THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.*

## INTRODUCTION

This Disclosure Statement provides information, pursuant to section 1125 of the Bankruptcy Code, regarding the Plan, a copy of which is attached hereto as **Exhibit A**.

The Debtors believe that the Plan will enable the Debtors to accomplish the objectives of an orderly liquidation of the Debtors' assets and maximizing creditor recoveries, and that acceptance of the Plan is in the best interest of the Debtors' estates and holders of Claims. Accordingly, the Debtors urge the holders of Claims to vote to accept the Plan.

The Debtors are seeking the Bankruptcy Court's approval of the Plan. Section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing information of a kind, and in sufficient detail as is reasonably practicable, to enable a hypothetical investor to make an informed judgment regarding acceptance of that chapter 11 plan. The Debtors submit this Disclosure Statement in accordance with such requirements.

## ARTICLE I.
## OVERVIEW OF THE DISCLOSURE STATEMENT AND PLAN

The Plan contains three primary divisions. First, the Plan provides for the distribution of the $1.0MM sales proceeds it received upon the sale of the Little Big Burger restaurant locations located in the Oregon area. Secondly, it notifies creditors that the Boudreaux's Cajun Kitchen entity is administratively insolvent, and there will be no distributions to creditors. Third, the Plan provides for the reorganization of the parent entity, Amergent Hospitality Group, Inc., through the cancellation of equity and subordinated unsecured claims and the issuance of new common stock to the secured and unsecured creditors of AHGI.

Prior to discussing the details of the Plan, this Disclosure Statement will discuss the Debtors' businesses, pre-petition assets and pre-petition liabilities. It will then discuss the key events leading to this chapter 11 filing. Next, this Disclosure Statement will summarize the significant events occurring during this Chapter 11 proceeding. This Disclosure Statement will then summarize the assets available in the case and discuss the claims held by creditors. This Disclosure Statement will then discuss certain of the key provisions of the Plan and the risk factors associated therewith. This Disclosure Statement will also discuss the actual confirmation process.

## ARTICLE II.
## BUSINESS OVERVIEW AND CORPORATE HISTORY

### 2.01   Overview of the Debtors' Business

As of the Petition Date, American Hospitality Group, Inc. owned and operated approximately 5 fast-casual restaurant brands: Little Big Burger ("LBB"); Burgers Grilled Right ("BGR"); Boudreaux's Cajun Kitchen ("BCK"); Jaybee's Chicken Palace and PizzaRev. Not all of the subsidiaries of AGHI filed

for Chapter 11. Only the parent company, AGHI, and its subsidiaries for the LBB and BCK brands filed for Chapter 11 protection. The Debtors' operational restaurants are described in Exhibit A attached hereto.

AGHI's principal office is located at 7529 Red Oak Lane, Charlotte, North Carolina 28226. The Debtors own no real estate, but leased each of the store locations. The primary tangible assets of the Debtors consist of the leased locations, store-level bank accounts and a small amount of accounts receivable in the form of credit card receipts (typically 1-3 days).

The board of directors of AHGI consists of Mike Pruitt, Eric Wagoner and Keith Johnson. The officers of the Debtor include Mr. Pruitt as CEO/President and Steve Hoelscher as CFO. Subsidiaries of AHGI are specified in **Schedule 1** attached hereto (the "Organization Chart), which also indicates filing and non-filing subsidiaries. In general, each store location was held in a limited liability company (a "Store Subsidiary") organized in the state of the store location. All Store Subsidiaries are owned by a brand parent company (a "Brand Subsidiary") such as nondebtors BGR Acquisitions, LLC (holds BGR stores), Debtor LBB Acquisition, LLC (holds LBB) and Debtor I10/I20 Cuisine LLC (holds BCK brand, hereinafter, "BCK"). All of BCK stores are directly leased by I10/I20 Cuisine, LLC, which has no subsidiaries.



**2.02    Prepetition Capital Structure**

Secured claimants of the Debtors consist of store-level Receivables Purchase Financing (the LBB Stores), the Boudreaux's Seller Financing (BCK only), and the Oz Rey Secured Debentures (AGHI parent level), discussed as follows:

*BCK Seller Financing.* BCK acquired certain of the BCK restaurants from Boudreaux's Cajun Kitchen, Inc., a Texas corporation, unaffiliated with the Debtors (the "BCK Seller"), in approximately March, 2023. BCK allegedly executed (a) a 6.0% Secured Convertible Promissory Note (the "BCK Seller Note") in favor of the BCK Seller; and (b) a Security Agreement in all personal property and proceeds. A Guaranty was allegedly executed by AHGI of the BCK Seller Note. The BCK Seller filed a UCC1 Financing Statement against BCK on or about March 28, 2023. Rewards Network is not a party to a Deposit Account Control Agreement. Accordingly, the Debtor asserts that the BCK Seller at most has a perfected security interest in the BCK' FF&E, accounts receivable and the proceeds thereof. The Debtor estimates the asserted balance of the BCK Seller Note to be $1.3MM.

*Rewards Network Receivables Purchase Financing.* Rewards Network Establishment Services Inc., a Delaware corporation ("Rewards Network") and the LBB Store Subsidiaries are parties to a Rewards Network Receivables Purchase and Marketing Agreement dated April 5, 2023. Rewards Network is not a party to a Deposit Account Control Agreement. There is no UCC1 on file with Rewards Network as a named secured party; however, there are UCC1s filed by Corporation Service Company, as representative, that appears to be Financing Statements for an accounts receivable purchaser, covering all personal property, fixtures and proceeds. Accordingly, the Debtor asserts that Rewards Network at most has a perfected security interest in the LBB Store Subsidiaries FF&E, accounts receivable and the proceeds thereof. The Debtor estimates Rewards Network asserts a claim against the LBB Store Subsidiaries in the amount of $344,000.

*BCK Receivables Purchase Financing.* Libertas Funding, LLC ("Libertas") is a party to an Agreement[s] of Sale of Future Receipts with Boudreaux's and AHGI (Boudreaux's Cajun Kitchen) dated January 25, 2024 and March 13, 2024. Libertas is not a party to a Deposit Account Control Agreement but holds an ECF Authorization only. There is no UCC1 on file with Libertas as a named secured party; however, there is a UCC1 filed by Corporation Service Company, as representative, that appears to be a Financing Statement for an accounts receivable purchaser, covering "all personal property and fixtures…. and proceeds." Accordingly, the Debtor asserts that Libertas at most has a perfected security interest in BCK's FF&E, accounts receivable and the proceeds thereof, subordinate to that of the BCK Seller Note. The Debtor estimates Libertas' asserts a claim against Boudreaux's in the amount of $344,000.

*LBB Platform Receivables Purchase Financing.* LG Funding LLC ("LG Funding") and LBB Platform LLC are parties to a Standard Merchant Cash Advance Agreement dated January 25, 2024. LG Funding is not a party to a Deposit Account Control Agreement. There is no UCC1 on file with LG Funding as a named secured party and none that appear to be filed by any nominee. Accordingly, the Debtor asserts that LG Funding is likely unsecured as having failed to file a Financing Statement. The Debtor estimates LG Funding's claim against LBB Platform, LLC at $20,228.

*LBB Division Receivables Purchase Financing.* LG Funding and Quinto LLC are parties to a Standard Merchant Cash Advance Agreement dated January 25, 2024. LG Funding is not a party to a Deposit Account Control Agreement. There is no UCC1 on file with LG Funding as a named secured party and none that appear to be filed by any nominee. Accordingly, the Debtor asserts that LG Funding is likely unsecured as having failed to file a Financing Statement. The Debtor estimates LG Funding's claim against Quinto LLC at $15,171.

*LBB Progress Receivables Purchase Financing*. Kapitus LLC ("Kapitus") and LBB Progress Ridge LLC are parties to a Forward Purchase Agreement (Fixed ACH Delivery) dated October 4, 2023. LG Funding is not a party to a Deposit Account Control Agreement. This agreement is purportedly cross-collateralized with assets of AHGI, Quinto LLC, Noveno LLC, LBB Platform, LLC and I10/I20 Cuisine LLC (the "Debtor Kapitus Collateral Parties") and other non-debtor affiliates; however, no party other than arguably LBB Progress Ridge, LLC signed the agreement. There is no UCC1 on file with Kapitus as a named secured party; however, there is a UCC1 filed in late October, 2023 by CT Corporation System, as representative, that appears to be a Financing Statement for an accounts receivable purchaser, covering Receivables, Inventory, Equipment, … and proceeds thereof. Accordingly, the Debtor asserts that LG Funding at most has a perfected security interest in the Debtor LBB Progress Ridge, LLC's FF&E, accounts receivable and the proceeds thereof, subordinate to that of Rewards Network. The Debtor estimates LG Funding assets a claim against LBB Platform, LLC in the amount of $71,487.

*Oz Rey Secured Debentures*. Secured claims asserted against the parent entity, AHGI, include the Oz Rey Debentures. On or about April 1, 2020, AHGI issued 10% Secured Convertible Debentures (the "Oz Rey Debentures") in the original principal amount of $4,037,889.00 to Oz Rey, LLC ("Oz Rey"). On or about March 29, 2022, AHGI issued 8% Senior Unsecured Convertible Debentures (the "Senior Debentures") in the collective amount of $1,350,000 to Eric D'Olive ($50k); Equity Markets Adv LLC c/o Stephen Apolant ($250k); Bruce and Judy K. Hankerson ($150k); Michael Ho ($250k); Lisa E. Mannion ($150k); Pinous Reisz ($250k); and Seacor Capital Inc. ($250k). The Oz Rey Debentures were assertedly (i) secured by that certain Security Agreement dated April 1, 2020 and (ii) guaranteed by a Subsidiary Guarantee dated April 1, 2020, both executed by AHGI and certain of, but not all, of the subsidiaries. Oz Rey executed one or more Subordination Agreements dated March 29, 2022, subordinating the right to collection on the Oz Rey Debentures to the Senior Debentures. Oz Rey filed a single UCC1 Financing Statement against AHGI (but not against any other Debtor) on April 1, 2020 covering "all assets" of AHGI. The Debtor estimates Oz Rey to assert a claim under the Oz Rey Debentures in the amount of $4,037,889 and the Senior Debentures to assert a claim in the amount of $1,300,000.

## ARTICLE III.
## EVENTS LEADING TO THE CHAPTER 11 FILINGS

AHGI (formerly Chanticleer Holdings) launched June of 2005 as an investment company. In 2007, AHGI converted to an operating company with opportunity to focus on the hospitality and leisure dining space after the death of the founder of Hooters which was one of AHGI's investments. In late 2007, I relinquished the President title of AHGI but remained as Chairman/CEO focused on investor relations and M & A opportunities. In 2015, AHGI acquired Little Big Burger in 2015 for $6 million, $4 million in cash & $2 million in shares. The Debtor acquired Boudreaux's Cajun from Boudreaux's Cajun Kitchen, Inc. in March 17, 2023 for $3.75 million, including the BCK Seller Note. The Debtor raised preferred equity to make the first two payments, and the remainder was seller financed, as discussed above. The AGHI also acquired the restaurant/gaming facility in Jantzen Beach in October, 2022.

From 2016 to mid-2019 AGHI was in growth mode funded in part with debt. Decreased revenue due to COVID; new expenses associated with heavily regulated geographic markets; and other factors depleted company assets. The Debtors were forced to close a number of locations which resulted in extensive landlord deficiency claims and associated litigation costs. The Debtors have seen deterioration of profitability based on labor cost, commodity cost, inflation impact on our consumer and turnover in leadership.

After COVID, Oz Rey acquired certain of the outstanding obligations of AHGI on April 1, 2021 for funds for growth in our portfolio of brands in approximately 2014. AHGI sold some of the brands in 2019, others closed during COVID or shortly thereafter. AHGI issued the Senior Debentures to raise funds to transaction costs on an attempted transaction with Everbowl (a San Diego company). AHGI has investigated multiple opportunities for merger or acquisition. The Debtors obtained the receivables financing discussed above to cover losses while such opportunities were investigated.

In January 2024, given our significant downsizing, financial condition & our long time president resigning, I resumed as interim President. After analysis, the board of directors determined that Chapter 11 bankruptcy was necessary to prevent store lease evictions and terminations on profitable locations, critical vendor terminations and reprieve from loan payments while the Debtor seeks an orderly sale of assets preserving going concern value or other viable reorganization exit

## ARTICLE IV.
## KEY EVENTS DURING THE CHAPTER 11 CASES

### 4.01   Commencement of the Chapter 11 Cases

On August 11, 2019, each of the Jointly Administered Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Bankruptcy Court"). The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [ECF No. 38]. The Debtors continue to manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### 4.02   No Formation of the Creditors' Committees

No Official Committee of Unsecured Creditors has been formed in this Case.

### 4.03   Petition Dates and First Day Motions

The Debtors' Chapter 11 Petitions were filed on July 18, 2024. The "First Day Motions" were filed on July 22, 2024, including motions for joint administration, use of cash collateral, maintaining bank accounts, and paying pre-petition employee wages. Hearings on the First Day Motions were held on July 23, 2024, with several motions granted on an interim basis. Final Orders were issued on August 21, 2024 on the first day motions for maintaining bank accounts and prohibiting utilities from altering services.

### 4.04   Sale Motions

During the proceeding, the Debtor sought to sell its Little Big Burger and Boudreaux's Cajun Kitchen stores. The Debtors filed their motion to sell the Little Big Burger Brand on December 31, 2024, with interim relief granted on January 14, 2025. The sale was approved by final order entered January 30, 2025 and closed on or about January 31, 2025 for a gross purchase price of $1,000,000, as discussed in more detail below. The Debtors filed their motion to sell the Boudreaux's Cajun Kitchen Brand on January 6, 2025, with interim relief granted on January 14, 2025. The sale was approved by final order entered January 30, 2025 and closed on or about February 4, 2025 for a gross purchase price of $150,000, as discussed in more detail below.

**4.05     Relief from Stay**

The Court granted relief from the automatic stay as to landlord Houston Gulfgate Partners, L.P. on February 19, 2025.

**4.06     Monthly Operating Reports**

Monthly Operating Reports have been filed monthly through March 2025.

**4.07     Sales of Estate Assets**

Following the Petition Date, the Debtors, in consultation with their advisors, pursued a marketing process for the sale of the Debtors' assets. Transfer of the Debtors' Cases to the Bankruptcy Court

**A.       Sale of Burgers Grilled Right (BGR) Restaurants**

A nondebtor subsidiary of the Debtor, BGR Acquisitions, LLC sold its interests in the remaining Burgers Grilled Right Restaurants to the purchaser group consisting of Equity Markets Advisory, LLC, PR Diamonds, Inc., Seacor Capital, Inc., Bruce Hankerson and Lisa E. Mannion for a total credit on their secured claims in this Case the amount of $831,604.

**B.       Sale of Little Big Burger (LBB) Restaurants**

The Debtor filed its Motion to Sell the Little Big Burger Restaurants on December 31, 2024. The Debtor sought approval bid procedures, which were granted on January 14, 2025 with a final hearing scheduled for January 29, 2025. Following the bid procedures, the Debtor received a number of competing offers. The sale was granted on January 30, 2025, approving the sale of the LBB Restaurants to Randy L L Corporation for $1,000,000.

| Debtor Name | Name | Allocation (%) | % EBITDA | Allocation | Allocation - Personal Property | Allocation - Brand | Allocation Remainder |
|---|---|---|---|---|---|---|---|
| Noveno | Alberta | 19.84% | 19.84% | 198,500 | 10,000 | 9,920 | 174,592 |
| Quinto | Division | 4.09% | 4.09% | 40,900 | 10,000 | 2,045 | 35,992 |
| Cuarto | Eugene | 4.86% | 4.86% | 48,600 | 10,000 | 2,430 | 42,768 |
| Platform | Platform | 19.84% | 19.84% | 198,400 | 10,000 | 9,920 | 174,592 |
| Progress Ridge | Progress Ridge | 21.98% | 21.98% | 219,800 | 10,000 | 10,990 | 193,424 |
| Sexto | Waterfront | 16.73% | 16.73% | 167,300 | 10,000 | 8,365 | 147,224 |
| Lake Oswego | Lake Oswego | 12.65% | 12.65% | 126,500 | 10,000 | 6,325 | 111,320 |
| TOTALS | | 100% | 100% | 1,000,000 | $70,000 | $50,000 | $880,000 |

### C. Sale of Boudreaux's Cajun Kitchen Restaurants

*BCK – West Loop.* The Debtor filed its Motion to Sell the Boudreaux's Cajun Kitchen (BCK) Restaurants on January 6, 2025. The Debtor sought approval bid procedures, which were granted on January 14, 2025: with a final hearing scheduled for January 29, 2025. After following the bid procedures, the Debtor received a number of competing offers. The motion was granted in part on January 30, 2025, approving the sale of the Galleria/West Loop LBB Restaurant to French Quarter Restaurants, Inc. for a purchase price of $150,000.

*BCK – Woodbridge/Gulfgate.* The lease for the Debtor's Woodbridge/Gulfgate location provided for its conclusion in the fall of 2025. This landlord was unwilling to grant any lease extensions. Accordingly, no buyer wished to purchase the remaining term of this lease. As a result, the Debtor consented to the lifting of the automatic stay was lifted as to Houston Gulfgate Partners, L.P. with respect to the BCK Woodbridge/Gulfgate location, as evidenced by an order entered on February 19, 2025. The landlord thereafter repossessed the leased location.

*BCK – Willowbrook.* The third BCK location in Houston was located at Willowbrook. The Willowbrook Location was arguably the least profitable of Debtor's Boudreaux's Cajun Kitchen locations. Debtor believed that the obligation to paid unpaid rent obligations will subsume any profitability from that location and potentially cut into the recovery from any other Boudreaux's locations. The Debtor and Landlord reached a resolution whereby the lease was terminated, the landlord waived its $1175,000 administrative rent claim and the Debtor transferred the remaining restaurant assets and goodwill to the

landlord. This agreement was approved by the Court on January 29, 2025. This transaction yielded no cash proceeds to the estate other than the forgiveness of the administrative claim.

## 4.08 Bar Date Orders

On July 22, 2024, the Court set a bar date for the filing of proofs of claim of nongovernmental entities for November 19, 2024 and for governmental entities, January 14, 2025. The United States Department of Labor filed a motion to file a late proof of claim in the estates of AHGI and LBB Progress Ridge. The Debtor has not opposed the motion to file the late claim.

## 4.09 Ongoing Investigations

The Debtors are also conducting several ongoing investigations regarding potential claims against those who may bear some level of responsibility for the losses leading to the filing of bankruptcy. While the Debtors continue to work, along with their advisors, towards an understanding and agreement on the key facts and potential claims and causes of action at issue in these investigations, the Debtors do not intend to place the Plan process on hold until the causes of action is concluded. The Debtors have identified potential causes of action for breaches of duty of care and loyalty by Robert Hersch and his Affiliates, including Oz Rey, LLC. These claims are reserved under the Plan. The Debtors intend to pursue confirmation of the Plan in tandem with investigations and the pursuit of certain claims and causes of action, many of which may be most efficiently administered, at least in part, by the Plan Trustee.

## ARTICLE V.
## THE PLAN

## OVERVIEW OF THE PLAN

The following is a brief summary of the Plan. **The description of the Plan set forth below constitutes a summary only and is qualified, in its entirety, by the Plan.** For a more detailed description of the terms of the Plan, see Article VI of this Disclosure Statement and the Plan itself, attached hereto as Exhibit A. In the event of any inconsistency between this Disclosure Statement and the Plan, the Plan controls.

The Plan provides for the liquidation and conversion of all of the Debtors' remaining assets to Cash and the distribution of the net proceeds realized from the sale of assets to creditors holding Allowed Claims in accordance with the treatment set forth in the Plan. In addition, the Plan contemplates the consolidation of the Estates into a single and the appointment of a Plan Trustee to, among other things, resolve Disputed Claims, implement the terms of the Plan, pursue Reserved Causes of Action, make distributions, and close the Chapter 11 Cases.

## ARTICLE VI.
## VOTING PROCEDURES AND REQUIREMENTS

### A. Classes Entitled to Vote on the Plan

The following Classes are the only Classes entitled to vote to accept or reject the Plan (collectively, the "Voting Classes"):

| Debtor Name | Classes Entitled to Vote |
|---|---|
| **Parent Company**<br>• Amergent Hospitality Group, Inc. | Class 1 (Secured)<br>Class 2 (Priority)<br>Class 3 (Unsecured) |
| **Little Big Burger (LBB) Debtors**<br>• LBB Acquisition, LLC<br>• LBB Acquisition I, LLC<br>• LBB Platform, LLC<br>• LBB Lake Oswego, LLC<br>• LBB Progress Ridge, LLC<br>• Noveno LLC (Alberta)<br>• Quinto LLC (Division)<br>• Sexto LLC (Waterfront)<br>• Cuarto LLC (Eugene) | Class 2 (Priority)<br>Class 3 (Unsecured) |
| **Boudreaux's Cajun Kitchen (BCK) Debtor**<br>• I10/I20 Cuisine LLC | Class 2 (Priority)<br>Class 3 (Unsecured) |

A Ballot for acceptance or rejection of the Plan is being provided only to Holders of Claims in the Voting Classes. If your Claim is included in one of the Voting Classes, you should read your Ballot and carefully follow the instructions included in the Ballot. Please use only the Ballot that accompanies this Disclosure Statement or the Ballot that the Debtors, or the Balloting Agent (as defined below) on behalf of the Debtors, otherwise provides to you. Before voting, such Holders in the Voting Classes should read this Disclosure Statement and its Exhibits, including the Plan, related Plan documents, and the instructions on the Ballot in their entirety. **YOUR VOTE ON THE PLAN IS IMPORTANT.**

If your Claim or Interest is <u>not</u> included in the Voting Classes, you are not entitled to vote on the Plan and you will not receive a Solicitation Package (defined below), or a Ballot.

### B.    Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan of liquidation by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted. **Acceptance by a class of claims requires an affirmative vote of more than one-half (1/2) in number of total allowed claims that have voted and an affirmative vote of at least two-thirds (2/3) in dollar amount of the total allowed claims that have voted.** Whether or not the Holder of a Claim votes on the Plan, such Person will be bound by the terms and treatment set forth in the Plan if the Plan is confirmed by the Bankruptcy Court. To be confirmed by the Bankruptcy Court, the Plan must be accepted by the requisite majority of the Holders of Claims in one of the Voting Classes, and must satisfy section 1129(b) of the Bankruptcy Code as to any Class that does not accept the Plan. In addition, the Bankruptcy Court must determine that each member of each Voting Class will receive property of a value, as of the Effective Date, that is not less than the amount such Class member would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Pursuant to the provisions of section 1126(e) of the

Bankruptcy Code, the Bankruptcy Court may disallow any vote accepting or rejecting the Plan if such vote is not cast in good faith.

**C.      Classes Not Entitled to Vote on the Plan**

Under the Bankruptcy Code, holders of claims and interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan. Accordingly, the following Classes of Claims and Interests are not entitled to vote to accept or reject the Plan:

| Debtor Name | Classes Not Entitled to Vote | Treatment; Deemed Voting |
|---|---|---|
| **Parent Company**<br>• Amergent Hospitality Group, Inc. | Classes 4-7 | Receive no Distribution under the Plan, Deemed to Reject |
| **Little Big Burger (LBB) Debtors**<br>• LBB Acquisition, LLC<br>• LBB Acquisition I, LLC<br>• LBB Platform, LLC<br>• LBB Lake Oswego, LLC<br>• LBB Progress Ridge, LLC<br>• Noveno LLC (Alberta)<br>• Quinto LLC (Division)<br>• Sexto LLC (Waterfront)<br>• Cuarto LLC (Eugene) | Class 1 (Secured) | Unimpaired; Deemed to Accept |
| | Classes 4-7 | Receive no Distribution under the Plan, Deemed to Reject |
| **Boudreaux's Cajun Kitchen (BCK) Debtor**<br>• I10/I20 Cuisine LLC | Class 1 (Secured) | Unimpaired; Deemed to Accept |
| | Classes 4-7 | Receive no Distribution under the Plan, Deemed to Reject |

**ARTICLE VII.**
**CONFIRMATION PROCEDURES**

**7.01    Hearing on Confirmation**

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of liquidation. The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the entities who have filed an objection to the Plan, if any, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation. All objections to the Plan must be filed with the Bankruptcy Court and served on the Debtors, the Debtors, and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that they are received on or before the deadline to file such objections as set forth therein.

**7.02     Requirements for Confirmation of the Plan**

Among the requirements for Confirmation are that the Plan is accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, is feasible, and is in the "best interests" of Holders of Claims and Interests that are Impaired under the Plan. The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a plan of liquidation. The Debtors submit that the Plan will be found to fully comply with the statutory requirements for Confirmation listed below.

- The Debtors have complied with the applicable provisions of the Bankruptcy Code.
- The Plan has been proposed in good faith and not by any means forbidden by law.
- Any payment made or to be made by the Debtors, Debtors or the Plan Trustee, for services or for costs and expenses in or in connection with the Chapter 11 Cases, in connection with the Plan and incident to the Chapter 11 Cases is subject to the approval of the Bankruptcy Court as reasonable.
- With respect to each Holder within an Impaired Class of Claims or Interests, each such Holder has (a) accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such Holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.
- With respect to each Class of Claims or Interests, such Class will have either (a) accepted the Plan, (b) be Unimpaired under the Plan, or (c) be subject to the "cram-down" provisions discussed below.
- The Plan provides for treatment of Claims, as applicable, in accordance with the provisions of section 507(a) of the Bankruptcy Code.
- If a Class of Claims or Interests is Impaired under the Plan, at least one Class of Claims or Interests that is Impaired under the Plan will have accepted the Plan, determined without including any acceptance of the Plan by any Insider.
- All fees payable under 28 U.S.C. § 1930 have been paid or will be paid as of the Effective Date.

**A.     Best Interests of Creditors**

Section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

Although the Plan effects a liquidation of the Debtors' remaining assets and a chapter 7 liquidation would have the same goal, the Debtors believe that the Plan provides the best source of recovery to Holders of Allowed Claims. The Committees, representing the interest of unsecured creditors in the Chapter 11 Cases, agree with this belief and support the Plan. First, liquidation of the Debtors' assets under chapter 7

would require the appointment of multiple chapter 7 trustees. Such appointments would delay distributions to holders of Allowed Claims and would likely provide a smaller distribution because of the additional fees and expenses which would be incurred during each chapter 7 liquidation process, including potential added time and expense incurred by chapter 7 trustees and any of their professionals who would need to familiarize themselves with the Chapter 11 Cases. Certain of the Debtors are already operating under the purview of the Chapter 11 Trustees. Moreover, the Plan provides for the cancellation of Intercompany Claims. However, should the Chapter 11 Cases be converted to cases under chapter 7, the Intercompany Claims would remain and there may be corresponding claims or causes of action among the different chapter 7 estates to recover and collect on account of such Intercompany Claims – increasing litigation costs and reducing creditor recoveries, as further discussed below. It simply makes little practical or economic sense at this late stage to convert the Chapter 11 Cases and appoint chapter 7 trusteees.

The Debtors believe that under the Plan all Holders of Impaired Claims and Interests will receive property with a value not less than the value such holders would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests.

The Debtors believe that one only needs to examine the realities of a hypothetical chapter 7 scenario in order to appreciate the significant benefits of the Plan. The multiple chapter 7 trustees appointed upon such conversion would be starting their work without the benefit of the negotiations, knowledge, and agreements that the Debtors have achieved.

## B.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that confirmation is not likely to be followed by the liquidation of the Debtors or the need for further financial reorganization, unless the Plan contemplates such liquidation. Indeed, section 1123(b)(4) of the Bankruptcy Code permits liquidating plans that "provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests" in chapter 11 proceedings and, thus, such a plan does not violate the requirements of Section 1129(a). Moreover, when a liquidating plan is tested against section 1129(a)(11), the feasibility standard is greatly simplified. In the context of a liquidating plan, feasibility is established by demonstrating the debtor's ability to make the payments anticipated by the plan and specifying the timing of the debtor's liquidation. Notably, there is no requirement that such payments will be guaranteed.

Here, the Plan provides for the liquidation of the Debtors by the transfer and sale of property and payment of the debts and the monetization of certain Causes of Action. Further, the Debtors maintain that there is a reasonable expectation that the payments required to be made during the term of the Plan will, in fact, be made.

## C.    Acceptance by Impaired Class

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in 7.02D below, each class of claims or interests that is impaired under a plan of liquidation, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims or interests as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims or interests in that class, counting only those claims or interests that actually voted to accept or to reject the plan. Thus, the Voting

Classes described herein will have voted to accept the Plan only if two-thirds in amount and a majority in number of Holders within the Class that actually vote on the Plan vote to accept.

### D.   Confirmation Without Acceptance by Impaired Class

The Bankruptcy Court may confirm a plan of liquidation over the rejection or deemed rejection of the plan of liquidation by a class of claims or interests if the plan of liquidation "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

#### 1.   No Unfair Discrimination

This test applies to Classes that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." The Debtors do not believe the Plan discriminates unfairly against any Impaired Class. The Debtors believe the Plan and the treatment of all Classes under the Plan satisfy the foregoing requirements for nonconsensual confirmation.

#### 2.   Fair and Equitable

This test applies to Classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no Class of Claims or Interests receive more than 100 percent of the amount of the Allowed Claims or Interests in such Class. As to a dissenting Class, the test sets different standards depending on the type of Claims or Interests of the Debtors in such Class. In order to demonstrate that a plan is fair and equitable, the plan proponent must demonstrate the following depending upon the nature of the relevant claim or interest holder:

- Class of Secured Claims: That each holder of a secured claim: (a) retains its liens on property to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim; (b) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof); or (c) receives the "indubitable equivalent" of its allowed secured claim.
- Class of Unsecured Claims: That either (a) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the non-accepting class will not receive or retain any property under the plan.
- Class of Equity Interests: That either (a) each holder of an impaired interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest, or (b) the holders of interests that are junior to the non-accepting class will not receive or retain any property under the plan.

The Debtors believe that the Plan satisfies the "fair and equitable" requirement notwithstanding that Classes 4-7 may be deemed to reject the Plan, because, as to each such Class, there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such Class will receive or retain any property on account of the Claims or Interests in such Class.

E.      **Alternatives to Confirmation and Consummation of the Plan**

The Debtors have evaluated alternatives to the Plan. After reviewing these alternatives, the Debtors believe that the Plan is the preferred approach to effectuating the Debtors' liquidation and maximizing recovery for all stakeholders and, therefore, is in the best interests of all constituencies. If the Plan is not confirmed, the realistic alternative likely will be a conversion of some or all of the Estates and a resulting liquidation under chapter 7 of the Bankruptcy Code.

**ARTICLE VIII.**
**<u>RISK FACTORS</u>**

The following provides a summary of various important considerations and other risk factors associated with the Plan; however, it is not exhaustive. There are risks, uncertainties, and other important factors that could affect the Plan and the Debtors undertake no obligation to update any such statement.

**8.01    Objections to the Plan's Classification or Amounts of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that parties in interest will not object to the classification or amounts of Claims and Interests under the Plan, or that the Bankruptcy Court will approve such classification or amounts.

**8.02    Failure to Satisfy Voting Requirements**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

**8.03    Amendment of Plan by the Debtors Prior to Confirmation**

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan or waive any conditions thereto if and to the extent necessary or desirable for Confirmation. The potential impact of any such amendment or waiver on holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. In addition, if the Debtors seek to modify or amend the Plan after receiving sufficient acceptances, but prior to Confirmation, re-solicitation may be required.

**8.04    Non-Confirmation or Delay of Confirmation of the Plan**

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, findings by a bankruptcy court that: (a) such plan "does not

unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The Bankruptcy Court may decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes, or the Plan contains other terms disapproved of by the Bankruptcy Court. If the Debtors fail to achieve Confirmation, some or all of the Chapter 11 Cases may be converted to a liquidation under chapter 7 of the Bankruptcy Code.

Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court is not obligated to confirm the Plan as proposed. The Bankruptcy Court could decline to confirm the Plan if the Bankruptcy Court found that any of the statutory requirements for confirmation had not been met.

If the Plan is not confirmed by the Bankruptcy Court, (a) the distributions that Holders of Claims or Interests ultimately would receive, if any, with respect to their Claims or Interests is uncertain, and (b) there is no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that will be acceptable to the Bankruptcy Court and the Holders of Claims or Interests.

## 8.05    Non-Consensual Confirmation

The Debtors intend to seek Confirmation notwithstanding the deemed rejection of the Plan by certain Classes of Claims or Interests. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code if the Plan satisfies section 1129(b) of the Bankruptcy Code. To confirm a plan over the objection of a dissenting class, the Bankruptcy Court also must find that at least one Impaired Class (which cannot be an "insider" class) has accepted the Plan.

## 8.06    Other Parties in Interest May Be Permitted to Propose Alternative Plans that Are Less Favorable to Certain Stakeholders

Under the Bankruptcy Code, a debtor in possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization for an initial period of 120 days from filing plus additional extensions granted by the Bankruptcy Court. Such exclusivity period can be reduced or terminated, however, upon order of the Bankruptcy Court. Currently, the Debtors do not have the exclusive right to file a plan in the IOI Debtor cases. Other parties in interest can seek authority from the Bankruptcy Court to propose an alternative plan.

## 8.07    Conversion to Chapter 7

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, some or all of the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets and distribute the sale proceeds in accordance with the priorities established by the Bankruptcy Code. See Article VII.C for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

**8.08    Proceeds of Sales**

The proceeds that will be realized from the sale of the remaining Assets of the Debtors may be less than what is currently anticipated due to a broad array of factors, including but not limited to, lack of bidder interest, market fluctuations or depreciation, and broader economic conditions.

**ARTICLE IX.**
**DISCLOSURE STATEMENT DISCLAIMER**

**9.01    Information Contained Herein is for Soliciting Votes**

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

**9.02    No Legal or Tax Advice is Provided to You by this Disclosure Statement**

**This Disclosure Statement is not legal advice to you**.    The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or an Existing Equity Interest should consult his, her or its own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Existing Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

**9.03    No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors and/or the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Existing Equity Interests, or any other parties-in-interest.

**9.04    Failure to Identify Claims, Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular Claim, litigation Claim or objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Debtors, the Debtors and/or the Plan Trustee may seek to investigate Claims, file and prosecute objections to Claims, and/or bring Causes of Action irrespective of whether this Disclosure Statement identifies such Claims, Causes of Action, or objections to Claims.

**9.05    No Waiver of Right to Object or Right to Recover Transfers and Assets**

Except as otherwise specifically provided in the Plan, the vote by a Holder of an Allowed Claim to accept or reject the Plan does not constitute a waiver or release of any Claims or rights of the Debtors, the Debtors, and/or the Plan Trustee to object to that Holder's Allowed Claim, or to bring Causes of Action, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

**9.06    Reliance Upon Debtors' Information**

Counsel to and other advisors retained in the respective Chapter 11 Cases have relied upon information based on the Debtors' books and records in connection with the preparation of this Disclosure

Statement. Although counsel to and other advisors retained in the respective Chapter 11 Cases have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

**9.07    Potential Exists for Inaccuracies, and the Debtors have no Duty to Update**

The Debtors make the statements contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

**ARTICLE X.**
**CERTAIN UNITED STATES**
**FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan, is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim or Interest. This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the U.S. federal income tax consequences of the Plan. Any such changes or interpretations may be retroactive and could significantly affect the

**10.01   A.       U.S. federal income tax consequences of the Plan.**

No ruling has been requested or obtained from the Internal Revenue Service (the "IRS") with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto. No representations or assurances are being made to the Holders of Claims or Interests with respect to the U.S. federal income tax consequences described herein.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

**10.02   Certain Federal Income Tax Consequences to the Debtors**

The implementation of the Plan is not expected to materially reduce or otherwise significantly affect the amount of tax attributes, except as noted below under "382(l)(5) Bankruptcy Exception."

The amount of any consolidated net operating losses ("NOLs"), tax-credit carryforwards, and amortizable tax basis remains subject to adjustment by the IRS. Under legislation enacted in 2020 in response to the COVID-19 pandemic, NOLs generated by Debtors in taxable years beginning after December 31, 2017 and before January 1, 2021 can be carried back and deducted from its taxable income generated within the five preceding taxable years and the remainder can be carried forward and deducted from the Debtors' taxable income in subsequent taxable years. For taxable years beginning after December 31, 2020, NOLs cannot be carried back and taxable income may only be offset by the sum of (i) the aggregate amount of NOLs carried to such taxable year that arose in taxable years beginning before January 1, 2018, plus (ii) the lesser of (A) the aggregate amount of NOLs carried to such taxable year that arose in taxable years beginning after December 31, 2017 or (B) 80% of a Debtors' taxable income generated during the taxable year. Any remainder can be carried forwarded indefinitely and used to offset taxable income in a future taxable year (subject to the limitations described above). Amortizable tax basis in intangible assets can generally be deducted ratably from the Debtors' taxable income over the 15-year period commencing with the year the intangible asset is acquired.

Section 382 of the IRC contains certain rules limiting the ability of corporations to utilize NOLs when there has been an "ownership change" (the "Annual Section 382 Limitation"). An "ownership change" generally is defined as a more than 50 percentage point change in ownership of the value of the stock of a "loss corporation" (a corporation with NOLs) that takes place during the three-year period ending on the date on which such change in ownership is tested.

As a general rule, the Annual Section 382 Limitation equals the product of the value of the stock of the loss corporation (with certain adjustments) immediately before the ownership change and the applicable "long-term tax-exempt rate," a rate published monthly by the Treasury Department (1.03% for ownership changes that occur during January 2021). Any unused portion of the Annual Section 382 Limitation generally is available for use in subsequent years. The Annual Section 382 Limitation is increased in the case of a corporation that has net unrealized built-in gains ("NUBIG"), i.e., gains economically accrued but unrecognized at the time of the ownership change, in excess of a threshold amount. Such a corporation can use NOLs in excess of its Annual Section 382 Limitation to the extent that it realizes those NUBIGs for U.S. federal income tax purposes in the five years following the ownership change. For purposes of determining the Annual Section 382 Limitation for a consolidated tax group, the determination as to whether the group has a NUBIG generally is made on a consolidated basis (*i.e.*, by netting the built-in losses and built-in gains of all members of the group).

In addition to limiting a corporation's ability to use NOLs, the Annual Section 382 Limitation may also apply to certain losses or deductions which are "built-in" as of the date of the ownership change and that are subsequently recognized. If a loss corporation has a net-unrealized built-in loss ("NUBIL") at the time of the ownership change, then any built-in losses or deductions (which for this purpose includes a portion of the depreciation or amortization of depreciable or amortizable assets that have a built-in loss) that are recognized during the following five years (up to the amount of the original built-in loss) generally will be subject to the Annual Section 382 Limitation. Special rules apply for purposes of determining the amount of built-in losses of a consolidated tax group that are subject to an Annual Section 382 Limitation. Absent an applicable exception (discussed below), a Company NUBIL would also be subject to the Annual Section 382 Limitation.

Section 382(l)(5) of the IRC provides an exception to the application of the Annual Section 382 Limitation when a corporation is under the jurisdiction of a court in a Title 11 case (the "382(l)(5) Bankruptcy Exception"). The 382(l)(5) Bankruptcy Exception provides that where an ownership change occurs pursuant to a bankruptcy reorganization or similar proceeding, the Annual Section 382 Limitation will not apply if the pre-change shareholders and/or "qualified creditors" (as defined by applicable

Treasury Regulations) own at least 50 percent of the stock of the reorganized corporation immediately after the ownership change. However, under the 382(l)(5) Bankruptcy Exception, a corporation's pre-change losses and excess credits that may be carried over to a post-change year must be reduced to the extent attributable to any interest paid or accrued on certain debt converted to stock in the reorganization. In addition, if the 382(l)(5) Bankruptcy Exception applies, a second ownership change of the corporation within a two-year period will cause the corporation to forfeit all of its unused NOLs that were incurred prior to the date of the second ownership change. If a corporation qualifies for the 382(l)(5) Bankruptcy Exception, the use of its NOLs will be governed by that exception unless the corporation affirmatively elects for the provisions not to apply.

If a corporation in bankruptcy is not eligible for the 382(l)(5) Bankruptcy Exception or elects out of that provision, a special rule under Section 382(l)(6) of the IRC will apply in calculating the Annual Section 382 Limitation. Under this special rule, the Annual Section 382 Limitation will be calculated by reference to the lesser of the value of the corporation's stock (with certain adjustments) immediately after the ownership change (as opposed to immediately before the ownership change, as discussed above) or the value of the Debtors' assets (determined without regard to liabilities) immediately before the ownership change.

Although it is expected that the Company will undergo an ownership change as a result of the implementation of the Plan, the Company intends to take the position that it qualifies for the 382(l)(5) Bankruptcy Exception described above. Accordingly, the Company does not expect to be subject to the Annual Section 382 Limitation as a result of the implementation of the Plan.

## 10.03   Federal Income Tax Treatment of the Trust

Upon the confirmation of the Plan, the Trust Assets will be transferred to the Trust, unless previously transferred to the Trust by order of the Bankruptcy Court, including the order of the Bankruptcy Court confirming the Plan. In consideration thereof, the Trust will assume the Debtors' obligations to make distributions in accordance with the Plan. The transfer of Trust Assets to the Trust should be treated for U.S. federal income tax purposes as a deemed transfer of those assets to the holders of Claims in exchange for their Claims, immediately followed by a deemed contribution of those assets to the Trust by such holders in exchange for a beneficial interest in the Trust. The Debtors believe that with respect to Allowed Claims the Trust would qualify as a "liquidating trust," as defined in Treasury Regulation section 301.7701-4(d), and would therefore be taxed as a grantor trust, of which the holders of Allowed Claims would be treated as the grantors and deemed owners. As soon as reasonably practicable after the transfer of the Trust Assets to the Trust, the Trustee of the Trust shall make a good faith valuation of the Trust's assets. All parties to the Trust (including but not limited to the Debtors and the beneficiaries of the Trust) must consistently use such valuations for all U.S. federal income tax purposes. Thus, no tax should be imposed on the Trust itself or on the income earned or gain recognized by the Trust. Instead, holders of Allowed Claims would be taxed on their allocable shares of such income and gain in each taxable year, whether or not they received any distributions from the Trust in such taxable year. The Estate Trust would pay federal, state, and local tax on the taxable income and gain allocable to holders of Disputed Claims on behalf of such holders and, when such Disputed Claims were ultimately resolved, holders whose Disputed Claims were determined to be Allowed Claims would receive distributions from the Trust net of taxes that the Trust had previously paid on their behalf.

It is possible, however, that the IRS could require a different characterization of the Trust, which could result in different and possibly greater tax liability to the Trust or holders of Allowed Claims. If the IRS determines that the powers granted to the Plan Trustee or the activities of the Plan Trustee are greater than those normally associated with carrying out the liquidation and distribution of assets transferred to a

liquidating trust, as described in Treasury Regulation section 301.7701-4(d), the IRS may attempt to re-characterize the Trust as a complex trust under IRC section 641 or as a corporation. A complex trust generally is subject to tax on income received, less deductions allowed for its expenses and for distributions that it makes to creditor beneficiaries up to the amount of its distributable net income ("DNI"), as defined in IRC section 643(a). The Trust would be taxed on any current DNI not distributed to the holders of Allowed Claims, and such holders would be taxed on income currently distributed to them by the Trust (up to the amount of their proportionate share of the Trust's DNI for that year).

Alternatively, the IRS may attempt to characterize the Trust as a qualified settlement fund ("QSF") pursuant to Treasury Regulations under IRC section 468(g) (the "QSF Regulations"). The QSF Regulations generally do not apply to trusts which are established to satisfy claims of general trade creditors and debt holders in a bankruptcy case. The QSF Regulations, however, do apply to a trust which is established to satisfy claims asserting liability: (i) arising out of a tort, breach of contract, or violation of law; or (ii) otherwise designated by the IRS. Thus, if the IRS asserted that Allowed Claims arose from such causes (*e.g.*, the fraudulent sale of securities or other obligations), the Trust could be treated as a QSF. If the Trust were treated as a QSF, it would be treated as a separate taxable entity subject to federal income tax at the maximum tax rate applicable to trusts. In general, amounts transferred to the QSF to resolve or satisfy a liability for which the QSF was established are not included in gross income of the QSF. Pursuant to the foregoing, if the Trust were treated as a QSF, holders of Allowed Claims could receive decreased distributions.

If the Trust were determined by the IRS to be taxable not as a liquidating trust, the taxation of the Trust and the transfer of assets by the Debtors to the Trust could be materially different than is described herein and could have a material adverse effect on the holders of Allowed Claims.

## 10.04   Federal Income Tax Consequences to Holders of Claims

The federal income tax consequences of the Plan to a holder of a Claim will depend upon several factors, including but not limited to: (i) whether the holder's Claim (or a portion thereof) constitutes a Claim for principal or interest, (ii) the origin of the holder's Claim, (iii) the type of considerations received by the holder in exchange for the Claim, (iv) whether the holder is a resident of the United States for tax purposes (or falls into any of the special classes of taxpayers excluded from this discussion as noted above), (v) whether the holder has taken a bad debt deduction or worthless security deduction with respect to this Claim, and (vii) whether the holder receives distributions under the Plan in more than one taxable year. HOLDERS ARE STRONGLY ADVISED TO CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIMS.

Generally, a holder of a Claim will recognize gain or loss equal to the difference between the "amount realized" by such holder and such holder's adjusted tax basis in the Claim. The "amount realized" is equal to the sum of the Cash and the fair market value of any other consideration received under the Plan in respect of a holder's Claim, including the fair market value of each such holder's proportionate share of the assets transferred to the Trust on the behalf of and for the benefit of such holder of Allowed Claims (to the extent that such Cash or other property is not allocable to any portion of the Claim representing accrued but unpaid interest (see discussion below)).

The transfer of Cash and assets to the Trust by the Debtors should be treated for federal income tax purposes as a transfer of such Cash and assets to the holders of Allowed Claims to the extent they are creditor-beneficiaries, followed by a deemed transfer of such assets by such beneficiaries to the Trust. As a result of such treatment, holders of Allowed Claims to be paid by the Trust will have to take into account the fair market value of their pro rata share, if any, of the Cash and assets transferred on their behalf to the

Trust in determining the amount of gain realized and required to be recognized upon consummation of the Plan on the Effective Date. In addition, since a holder's share of the assets held in the Trust may change depending upon the resolution of Disputed Claims, the holder may be prevented from recognizing any loss in connection with consummation of the Plan until the time that all such Disputed Claims have been resolved. Furthermore, a tax credit may be available to holders whose Disputed Claims are determined to be Allowed Claims to the extent that the Trust has previously paid taxes on their behalf.

The character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the Claim in its hands, the purpose and circumstances of its acquisition, the holder's holding period of the Claim, and the extent to which the holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.

**10.05   Allocation of Consideration to Interest**

A portion of the consideration received by a holder in satisfaction of an Allowed Claim pursuant to the Plan may be allocated to the portion of such Allowed Claim (if any) that represents accrued but unpaid interest. The Plan does not provide an allocation of the consideration to be received by the holders of Allowed Claims. Accordingly, the manner in which such allocation must be made for federal income tax purposes is not clear. If any portion of the distribution were required to be allocated to accrued interest, such portion would be taxable to the holder as interest income, except to the extent the holder has previously reported such interest as income.

In that event, only the balance of the distribution would be considered received by the holder in respect of the principal amount of Allowed Claim. Such an allocation would reduce the amount of the gain, or increase the amount of loss, realized by the holder with respect to the Allowed Claim. If any such loss were a capital loss, it would not offset any amount of the distribution that was treated as ordinary interest income (except, in the case of individuals, to the limited extent that capital losses may be deducted against ordinary income).

To the extent that any portion of the distribution is treated as interest, holders may be required to provide certain tax information in order to avoid the withholding of taxes. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE FEDERAL INCOME TAX TREATMENT OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS.

**10.06   Federal Income Tax Treatment of Holders of Equity Interests**

In accordance with the Plan, holders of Equity Interests in the Debtors will likely not receive a Distribution. Holders of an Equity Interest in the Debtors generally will be able to recognize loss in the amount of the holder's adjusted tax basis. The character of any recognized loss will depend upon several factors including, but not limited to, the status of the holder, the nature of the interest in the holder's hands, the purpose and circumstances of its acquisition, the holders' holding period, and the extent to which the holder had previously claimed a deduction for the likely worthlessness of all or a portion of such Equity Interest.

A loss generally is treated as sustained in the taxable year for which there has been a closed and competed transaction, and no portion of a loss with respect to which there is a reasonable prospect of reimbursement may be deducted until it can be ascertained with reasonable certainty whether or not such

reimbursement will be recovered. HOLDERS OF EQUITY INTERESTS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF LOSS FOR FEDERAL INCOME TAX PURPOSES, ON THE CONSUMMATION OF THE PLAN.

**10.07   Reservation of Rights**

The foregoing discussion is subject to change (possibly substantially) based on, among other things, subsequent changes to the Plan and events that may subsequently occur that may impact the timeline for the transactions contemplated by the Plan. The Debtors and their advisors reserve the right to further modify, revise or supplement this Article IX and the other tax related sections of the Plan and Disclosure Statement in accordance with the terms of the Plan and the Bankruptcy Code.

**ARTICLE XI.**
**SECURITIES LAWS MATTERS**

Section 1145 of the Bankruptcy Code provides that Section 5 of the Securities Act of 1933 and any State or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security do not apply to— (1) the offer or sale under a plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan— (A) in exchange for a claim against, an interest in, or a claim for an administrative expense in the case concerning, the debtor or such affiliate; or (B) principally in such exchange and partly for cash or property.  The Plan provides for the issuance of new common stock in exchange solely for claims against the Debtor.   Accordingly, Section 1145 exempts the issuance of the new common stock under the Plan from Section 5 of the Securities Act of 1933.

**ARTICLE XII.**
**CONCLUSION AND RECOMMENDATION**

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' overall creditor body than would otherwise result from any other scenario. Any alternative to confirmation of the Plan, moreover, could result in extensive delays and increased administrative expenses. Accordingly, the Debtors urge holders of Claims in the Voting Classes to evidence their acceptance of the Plan by returning their Ballots so that they are timely received by the Balloting Agent.

[remainder of page intentionally blank]

Respectfully Submitted,

July 17, 2025

| Debtor | Case No. | Identifier |
|---|---|---|
| Amergent Hospitality Group, Inc. | 24-42483 | AHGI |
| I10/I20 Cuisine LLC | 24-42482 | BCK |
| LBB Acquisition, | 24-42484 | LBB Acquisition |
| LBB Acquisition 1 LLC | 24-42485 | LBBA1 |
| LBB Platform LLC | 24-42487 | LLB Platform |
| LBB Lake Oswego LLC | 24-42489 | LBB Lake Oswego |
| LBB Progress Ridge LLC. | 24-42490 | LBB Progress Ridge |
| Noveno LLC | 24-42491 | LBB Alberta |
| Quinto LLC | 24-42492 | LBB Division |
| Sexto LLC | 24-42493 | LBB Waterfront |
| Cuarto LLC | 24-42494 | LBB Eugene |

By: /s/ Mike Pruitt
Mike Pruitt,
CEO and authorized agent of each Joint Debtor
July 17, 2025

## EXHIBIT A


## JOINT PLAN OF LIQUIDATION
## (INTENTIONALLY OMITTED)